707 F.2d 702
 Terri Lee HALDERMAN, a retarded citizen, by her mother and
guardian, Winifred HALDERMAN, et al., Pennsylvania
Association for Retarded Citizens, et
al., Plaintiffs-Intervenors,
United States of America, Plaintiff-Intervenor,
v.
PENNHURST STATE SCHOOL & HOSPITAL, et al.
Appeal of W.M. and B.M. the Parents of P.M., a minor, in No.
82-1147.
Terri Lee HALDERMAN, a retarded citizen, by her mother and
guardian, Winifred HALDERMAN, et al., Pennsylvania
Association for Retarded Citizens, et
al., Plaintiffs-Intervenors,
United States of America, Plaintiff-Intervenor,
v.
PENNHURST STATE SCHOOL & HOSPITAL, et al.
Appeal of The Commissioners and Mental Health/Mental
Retardation Administrator of CHESTER COUNTY,
PENNSYLVANIA, in No. 82-1197.
 Nos. 82-1147, 82-1197.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 18, 1982.
Decided May 10, 1983.
Rehearing and Rehearing In Banc Denied May 24, 1983.
 
 Steven M. Coren (argued), Kittredge, Kaufman & Donley, Philadelphia, Pa., for appellants W.M. and B.M., the parents of P.M., a minor.
 Thomas M. Kittredge (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant Chester County.
 David Ferleger (argued), Alexander Ewing, Jr., Asst. U.S. Atty., Penelope A. Boyd, Philadelphia, Pa., for appellees.
 Thomas K. Gilhool (argued), Frank J. Laski, Michael Churchill, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for appellees, Pa. Ass'n for Retarded Citizens, et al.
 LeRoy S. Zimmerman, Atty. Gen., Debra K. Wallet, Allen C. Warshaw, Deputy Atty. Gen., Harrisburg, Pa., for amicus curiae the Com. of Pa.
 Before ALDISERT, SLOVITER, and ROSENN, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This appeal follows a district court order directing the transfer of P.M., a voluntarily committed, profoundly retarded minor child, from the Pennhurst State School and Hospital, a facility for the mentally retarded, to a community living arrangement (CLA) in Chester County. The district court issued its order after adopting a master's report recommending the transfer. P.M.'s parents and the County of Chester, appellants herein, argue that: the master's factual findings, as adopted by the district court, were clearly erroneous; and the transfer order violated the parents' constitutional rights. Because Judge Rosenn and I conclude that the hearing master and the district court erred, the judgment of the district court will be reversed.
 
 I.
 
 2
 A complicated procedural history forms the backdrop for this case. In its initial decision, the district court, relying on the eighth and fourteenth amendments to the Constitution, held that Pennhurst was an unconstitutional mode of providing residential services to the mentally retarded. Halderman v. Pennhurst State School and Hospital, 446 F.Supp. 1295 (E.D.Pa.1978). It ordered that Pennhurst be phased out and that its residents be placed in CLAs. Pursuant to Rule 53, F.R.Civ.P., the court appointed a special master who was empowered to "plan, organize, direct, supervise and monitor" the transition to the CLAs. Id. at 1326-28.
 
 
 3
 On appeal, we essentially affirmed the district court's order, but relied on federal statutory grounds rather than the United States Constitution. Halderman v. Pennhurst State School and Hospital, 612 F.2d 84 (3d Cir.1979). We vacated that portion of the trial court's order mandating that Pennhurst be closed and remanded the case for "individual determinations by the court, or by the Special Master, as to the appropriateness of an improved Pennhurst for each such patient." Id. at 114. Although we established a presumption in favor of placing individuals in CLAs, we emphasized that the "special needs and desires of individual patients must not be neglected in the process." Id. at 115. We made no mention of parental rights with respect to the transfer of minor children and did not indicate whether any such transfer had to be voluntary.
 
 
 4
 The United States Supreme Court granted certiorari on June 9, 1980, Pennhurst State School and Hospital v. Halderman, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980), and on June 30, 1980, pending its final disposition of the appeal, stayed our judgment to the extent that we mandated the movement of Pennhurst residents to CLAs, Pennhurst State School and Hospital v. Halderman, 448 U.S. 905, 100 S.Ct. 3046, 65 L.Ed.2d 1135 (1980) (interim order granting stay). The Court then reversed our decision, concluding that plaintiffs lacked standing under the applicable federal statute, and remanded the case for further consideration. Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). On remand we again affirmed the original relief ordered by the district court, this time on state law grounds, Halderman v. Pennhurst State School and Hospital, 673 F.2d 647 (3d Cir.1982). The Supreme Court again granted certiorari, Pennhurst State School and Hospital, 457 U.S. 1131, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (U.S.1982), but has yet to dispose of the appeal.
 
 
 5
 On the basis of our first appellate decision, the district court mandated that individual habilitation plans (IHPs) be developed supporting the transfer of Pennhurst's school age residents to CLAs. Although parents were permitted to participate as members of their child's IHP "team," parental consent to any transfer was not required. The IHP was first to be submitted to a court-appointed master. If the parents objected to the recommendations of the IHP, they could demand a hearing before the master for the purpose of determining "whether the living arrangements and services being provided the residents at Pennhurst [were] more beneficial to the resident's habilitation than the living arrangements and services which [had] been made ready in the community in accordance with the IHP." Halderman v. Pennhurst State School and Hospital, No. 74-1345, at 65 (E.D.Pa. Apr. 24, 1980) (order establishing transfer procedures), reprinted in app. at 25a. After such hearing, the master was to prepare a report for district court consideration. Parents could then file exceptions to the master's report with the district court under Rule 53, F.R.Civ.P. In light of the Supreme Court stay of June 30, 1980, the district court further ordered that no resident of Pennhurst could be transferred to a CLA unless such transfer was voluntary.
 
 
 6
 The question of P.M.'s transfer arose on October 13, 1981, when his IHP was prepared proposing that he be transferred from Pennhurst, where he had resided for over nine years, to a CLA in Chester County. The parents objected, calling into play a master's hearing. At the hearing, the parents refused to consent to the transfer. Two mental retardation professionals and representatives of Pennsylvania and Chester County, testified in support of the parents' position.
 
 
 7
 Notwithstanding these objections, the hearing master filed a report finding that the proposed transfer of P.M. was both "voluntary" and "more beneficial" and ordered "that the County ... is authorized and directed to proceed with the proposed placement of ... P.M. ...." Report of Hearing Master at 23-24, reprinted in app. at 298a-99a. Pursuant to Rule 53, F.R.Civ.P., the parents filed exceptions in the district court to the hearing master's report, asserting, inter alia, that the hearing master's finding and order violated the parents' constitutional right to direct the care and upbringing of their minor child. On February 26, 1982, after holding a hearing on the parents' exceptions, and sitting without a jury, the district court adopted the hearing master's report and dismissed all of the exceptions. On March 10, 1982, P.M. was transferred to the CLA where he remains today.
 
 
 8
 The parents and Chester County now appeal, asserting that the district court's transfer order should be reversed because: (1) the findings of the court and the hearing master are clearly erroneous, and (2) in reaching its decision the court violated the parents' constitutional rights.[1] The Commonwealth of Pennsylvania has filed an amicus curiae brief in which it endorses the appellants' position.
 
 II.
 
 9
 Appellants' arguments before this court raise both constitutional and non-constitutional claims. Because a court "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of," Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1941) (Brandeis, J., concurring), I will address the non-constitutional contention first.
 
 
 10
 Appellants contend that the master erred in "[f]inding that the proposed community placement of P.M. [would be] 'more beneficial' than his remaining at Pennhurst ...."[2] Exceptions to Hearing Master's Report at 4, reprinted in app. at 303a. Under Rule 53(e)(2), F.R.Civ.P., the district judge in a non-jury action shall accept the master's factual findings unless they are clearly erroneous, and our review of a trial court's adoption of a master's findings is governed by that same standard. Ray v. Safeway Stores, Inc., 614 F.2d 729, 730 (10th Cir.1980); International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696, 699 (3d Cir.1957), cert. dismissed, 355 U.S. 943, 78 S.Ct. 529, 2 L.Ed.2d 523 (1958). Further, we will reverse a district court's findings under the clearly erroneous standard only if they are "completely devoid of minimum evidentiary support," or bear "no rational relationship to the supporting evidentiary data." Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972).
 
 
 11
 In support of his finding, the hearing master relied on four factors: (1) the presumption in favor of community placement established by this court,[3] Halderman v. Pennhurst State School and Hospital, 612 F.2d 84 (3d Cir.1979); (2) evidence that the CLA staff had resolved many, but not all, of the safety and programmatic concerns previously noted by the parents;[4] (3) expert testimony in favor of the transfer which he considered more persuasive than the opposing testimony of the parents' experts; and (4) the evidence establishing that the CLA would have a 1:1 staff-to-patient ratio. Appellants offered no evidence, either to the master, the district court, or this court, to contradict any of these factors other than the relative persuasiveness of the experts' testimony. Therefore, on the basis of the uncontradicted evidentiary support, I conclude that the finding that the CLA would be "more beneficial" was not clearly erroneous. I now turn to appellants' constitutional contention.
 
 III.
 
 12
 Appellants argue that the district court, in adopting the master's report and ordering the transfer of P.M. over his parents' objections, failed to give sufficient weight to the parents' concerns and violated their constitutional rights. Because this question concerns the recognition, selection, and application of legal precepts, our review is plenary. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 103 (3d Cir.1981).
 
 A.
 
 13
 The existence, source, and scope of the substantive parental constitutional right to make decisions relating to general family matters, without governmental interference, has been the subject of continuing concern in constitutional adjudication. These cases have arisen in a variety of factual contexts. Regardless of the factual differences, however, the Supreme Court has consistently maintained that "freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."[5] Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) (public school regulation requiring teachers to take maternity leave for the five months prior to expected child birth held an unconstitutional interference with a woman's right to bear children). The Court has also noted that "the Constitution protects the sanctity of the family precisely because the institution of family is deeply rooted in this Nation's history and tradition." Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1936, 52 L.Ed.2d 531 (1977) (city zoning ordinance incorporating a restrictive definition of "family" held violative of fourteenth amendment). Further, the Court has recognized that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays" in promoting a way of life. Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977) (a child custody case upholding a state law that gives fathers of legitimate children an absolute veto over adoption decisions but denies that right to certain fathers of illegitimate children). See also Lehman v. Lycoming County Children's Services Agency, 648 F.2d 135, 163-66 (3d Cir.1981) (Rosenn, J., dissenting) (collecting and analyzing relevant Supreme Court child custody case law), aff'd, --- U.S. ----, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).[6]
 
 
 14
 These cases lead to the conclusion that the Constitution mandates a judicial obligation to respect, if not protect, parental authority in decisions relating to general family matters because of the importance of the parental role in family life. This parental role is "established beyond debate as an enduring American tradition," Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972), and recognized as "basic in the structure of our society," Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). The Court, however, has made it equally clear that, while parental decisionmaking is to be preferred in most circumstances, "the family itself is not beyond regulation in the public interest" and that in "[a]cting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (footnotes omitted).
 
 
 15
 Thus, the basic issue for the courts in parental right cases is to decide whether the state has demonstrated a sufficiently important interest to justify governmental interference with parental decisionmaking authority. This clearly requires a balancing of interests which the Court has carried out in a variety of circumstances. In so doing it has consistently applied a heavy presumption in favor of parental decisions.
 
 
 16
 The specific, independent parental interest asserted by appellants in the instant case is not the right to make general, family-related decisions, but rather the right of the parents to decide, free from governmental interference, matters concerning the growth, development, and upbringing of their children. The Supreme Court has addressed this right in cases involving parent-state conflicts in the areas of medical treatment and educational decisionmaking. The institutional treatment of mentally retarded children has elements of both. Medical issues arise in reviewing the parents' decision to voluntarily commit their child and educational issues arise in connection with habilitation decisionmaking.
 
 
 17
 In what it later described as perhaps the most significant statement in this area of the law, the Supreme Court recognized that parents, as head of the family unit, have the right, protected by the due process clause, "to direct the upbringing and education of [their] children ... [and that this right could] not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State." Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). There, a state law requiring that all children between the ages of eight and sixteen years attend public rather than private schools was declared invalid as an unreasonable interference with the parental right.
 
 
 18
 In Wisconsin v. Yoder, the Court was presented with a somewhat more complex conflict involving the parental right to direct the upbringing of their children coupled with the free exercise clause of the first amendment set against a state's compulsory school attendance law. The Court found the law unconstitutional. In doing so it stated, relying on Pierce, that "the values of parental direction of the ... upbringing and education of their children ... have a high place in our society," id. 406 U.S. at 213-14, 92 S.Ct. at 1532, and that the "primary role of parents in the upbringing of their children is now established beyond debate ...," id. at 232, 92 S.Ct. at 1541. But, the Court defined its analytical calculus in terms of the first amendment and not the acknowledged parental right to direct their child's upbringing. It stated that
 
 
 19
 a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children .... Id. at 214, 92 S.Ct. at 1532 (emphasis added).
 
 
 20
 One shortcoming of the Pierce decision, not rectified by Yoder, was that it did not define the full extent or quality of the parental right and did not determine what level of state interest might be necessary to authorize governmental interference with the right. In more recent decisions, however, the Court has begun to articulate an answer to these questions. In Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court invalidated a state law to the extent that it gave parents an absolute veto over the abortion decision of their minor child, made during the first trimester of pregnancy. The statute had been upheld below on the basis that it "safeguard[ed] the authority of [parents in the] family relationship." Id. at 73, 96 S.Ct. at 2843. While the Supreme Court recognized the existence of this "independent interest of the parent" it concluded that it would not support the right to an absolute veto because it was "no more weighty than the right of privacy of the competent minor mature enough to become pregnant." Id. at 75, 96 S.Ct. at 2844.
 
 
 21
 Under Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court held that the right of privacy, which included "a woman's decision whether or not to terminate her pregnancy," was a fundamental right requiring a compelling state interest to support any governmental interference, id. at 152-53, 93 S.Ct. at 726. Thus, by stating, in Planned Parenthood, that the parents' right to direct their child's upbringing was "no more weighty than the [child's] right of privacy," it could be argued that the parental interest herein at issue also rose to the level of a "fundamental" right and that it could be qualified only by a "compelling" governmental interest.
 
 
 22
 The "fundamental" rights argument seems refuted, however, in a more recent decision. Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). There, the conflict matched the parents' desire to have their child voluntarily committed to a mental institution against both the child's liberty interest to be protected against unnecessary confinement and the state's interest in reserving its limited mental health facilities for the truly needy. In describing the nature of the parental right at issue, the Court stated that "[o]ur jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." Id. at 602, 99 S.Ct. at 2504. It went on to caution, however, that "a state is not without constitutional control over parental discretion in dealing with children when their physical and mental health is jeopardized." Id. at 603, 99 S.Ct. at 2504. The Court concluded that "our precedents permit the parents to retain a substantial, if not the dominant, role in the [voluntary commitment] decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply." Id. at 604, 99 S.Ct. at 2505.
 
 
 23
 The Court further reasoned that this parental right to have a "substantial, if not dominant role in the [voluntary commitment] decision" must be balanced against the child's "substantial liberty interest in not being confined unnecessarily for medical treatment ...," id. at 600, 99 S.Ct. at 2503, and the state's "significant interest in confining the use of its costly mental health facilities to cases of genuine need," id. at 604-05, 99 S.Ct. at 2505 (emphasis added). The interests of the child would be sufficiently protected by requiring "a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied." Id. at 606, 99 S.Ct. at 2506. The state's interests would be protected by the hospital superintendent who was authorized both to deny commitment of a prospective patient on a determination that the person was not mentally ill or would not benefit from hospital care and to deny continued confinement for a current patient on a determination that the patient's recovery had progressed to the point where hospitalization was no longer needed. Id. at 605, 99 S.Ct. at 2505.
 
 
 24
 Therefore, Parham indicates that the parents' right to have their child voluntarily committed could be subordinated to either the child's basic liberty interest in not being unnecessarily confined or the state's significant interest in maintaining control over the utilization of its facilities. Because a compelling state interest is required to overcome a fundamental constitutional right, see Roe v. Wade, 410 U.S. at 152-53, 93 S.Ct. at 726, Parham clearly argues against the characterization of the parental right therein at issue, as fundamental. The view that this parental right is not fundamental also finds support in Yoder. There, it will be recalled, the Court recognized that violations of both this right and the free exercise clause were implicated by the state's compulsory school attendance law. In holding the law unconstitutional, however, the Court clearly relied primarily, if not solely, on the free exercise clause.
 
 
 25
 I read these cases, therefore, to establish that parents have a substantial constitutional right, as head of the family unit, to direct and control the upbringing and development of their minor children. If the parental decisions amount to abuse or neglect of the minor child then the parental right is no longer constitutionally protected, and the state, as parens patriae, may intervene to protect the child. Absent a showing of abuse or neglect, however, the parental right remains substantial and may be subject to governmental interference only when such interference is supported by a significant governmental interest.[7]
 
 B.
 
 26
 I now turn to the critical question presented by this appeal, whether this parental right was afforded sufficient consideration in the proceedings below. I will first analyze the master's report and then the district court's decision.
 
 1.
 
 27
 As stated in Part II, supra, the hearing master cited four factors in support of his finding that, for P.M., the CLA would be more beneficial than Pennhurst. These were the presumption in favor of transfer, the programmatic adjustments made by the CLA staff in response to the parents' concerns, the CLA's 1:1 staffing ratio, and the master's reliance on the pro-transfer experts. Nowhere does the master even recognize the existence of any constitutional right of the parents much less discuss the scope of that right and what level of governmental interest is necessary to overcome it. It is not clear from the record, however, whether the parents couched their objections to the master in constitutional terms. I must assume that they did not, and I therefore conclude that although the master's failure to address these constitutional concerns was error, it is not reversible error.[8] In their exceptions to the master's report the parents did invoke the Constitution.[9] I now turn to the question of whether the district court's adoption of the master's report violated the parents' rights.
 
 2.
 
 28
 The district court "adopt[ed] the Report of the Hearing Master and dismiss[ed] the [parents'] exceptions ...." App. at 367a. It did so after recognizing that the "parents' interests in directing the upbringing of their children is cognizable and substantial." App. at 362a, quoting Bartley v. Kremens, 402 F.Supp. 1039, 1057 (E.D.Pa.1975), vacated and remanded on other grounds, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), on remand sub nom., Institutionalized Juveniles v. Secretary of Public Welfare, 459 F.Supp. 30 (E.D.Pa.1978), rev'd and remanded, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). But, after recognizing the existence of this parental right, the court went on to explain that procedural protections only had been extended to appellants.[10] The district court failed to consider the parents' wishes as substantive evidence. The court then asserted that the parents claimed, over and above any procedural rights, "an absolute right to have their son remain at Pennhurst." App. at 364a. Adopting an in terrorem argument, the court stated that if it were "to accept the parents' position, parents of all Pennhurst residents would be accorded the right to overrule the treatment decisions of the Pennhurst staff, including the location of their child ...," id. at 365a, and held that the parents would not be allowed "to veto the decisions of the retardation professionals unless and until the parents can show that the recommended programs for their child will not provide adequate habilitation ...." Id. Thus, the district court mischaracterized the parents' constitutional right to direct the upbringing of their child as "absolute" and erroneously placed on them the burden of proving that the proposed transfer would be harmful. This is reversible error.
 
 
 29
 As I demonstrated earlier, parents have a substantial right to direct the upbringing of their minor children which can only be overcome either by a showing of abuse or neglect, or by proof of a significant governmental interest running counter to the express parental desires. Here there is no indication of abuse or neglect. The hearing master declared, "I do not mean to accuse [P.M.'s parents] of any kind of neglect of their son or insensitivity to his needs; that is clearly not the case." Id. at 289a. Neither the parties nor the district court challenged this statement. Moreover, it was not argued, either to the master or before the district court, and we cannot conclude, that the present treatment at Pennhurst amounts to abuse or neglect. Therefore, we may affirm the district court order only if we conclude that the evidence presented clearly established the existence of a significant countervailing governmental interest. Because the critical determination is the appropriateness of the transfer and its relative benefits for P.M., the governmental interest at issue here is the safety and well-being of P.M. The only evidence to support the existence of such an interest are the factors relied on by the hearing master in concluding that the CLA would be more beneficial to P.M. than Pennhurst. These factors were the judicially-created presumption in favor of transfer, the fact that the CLA program had been adjusted in response to parental criticism, the 1:1 staffing at the CLA, and the testimony of the pro-transfer experts. In my opinion, the totality of this evidence falls short of the quantum of support required to prove the existence of a significant governmental interest sufficient to negate the parents' substantial constitutional right.
 
 
 30
 Clearly, there was expert testimony offered both for and against the transfer decision. The four pro-transfer experts, while not present at the hearing, had their reports read into the record. None of them saw P.M. more than once prior to making his or her report and several of them supported the CLA placement only with some reservations.[11]
 
 
 31
 The parents' two expert witnesses testified that P.M. might regress at the CLA, that it was a more dangerous environment than Pennhurst, and that with the increased staff supervision at the CLA it might actually be more restrictive than Pennhurst. The master cautioned Dr. Rubin, one of the parents' experts, that it was unfair to conclude that the CLA was in fact a detrimental environment for P.M. because it "truly is an unknown." Id. at 174a. Dr. Rubin replied that "[w]e're not running an experiment on [P.M.]." Id. at 175a. Thus, while the hearing master "agree[d]" with the pro-transfer experts, he did so not because their testimony clearly overwhelmed the parents' experts but rather on a subjective determination that the CLA was "designed around [P.M.'s] potential rather than his limitations ...." Id. at 298a.
 
 
 32
 Also, the increased staffing ratio of the CLA, as indicated by some of the expert testimony, cannot be viewed as an entirely positive feature. It may have been required in large measure because of the increased freedom, and increased danger, that would be present in the community environment.[12] Finally, the programmatic changes effected in the CLA merely addressed some of the specific safety concerns of the parents, and not their more generalized concern, that, as parents, they did not believe that the CLA was the best place for their son. This leaves the judicially-created presumption as the principal factor supporting the transfer decision. In my view relevant commandments of the Constitution take precedence over such a presumption. Simply put, although this presumption would be important in deciding a cause where only substantive law is concerned it is not of sufficient weight to overcome the substantial constitutional right at issue here and cannot by itself tip the scales in favor of transfer.
 
 IV.
 
 33
 I conclude, therefore, that the district court did not afford to the parents' views the consideration that the Constitution demands. Where, as here, the evidence as to the preferable setting was conflicting, and even assuming that the hearing evidence preponderated on the proposition that better care was available at the CLA, in the absence of either a discrete finding by the master that the treatment P.M. had at Pennhurst was tantamount to "abuse and neglect," or the existence of evidence sufficient to support a significant countervailing governmental interest, the wishes of the parents should have been given the "substantial, if not dominant, role in [that transfer] decision." Because the evidence did not establish either abuse and neglect or the existence of a significant governmental interest, it was reversible error to transfer the child and to ignore the parents' wishes.
 
 
 34
 A majority have agreed that the judgment of the district court will be reversed. I would reverse outright with a direction that the district court enter an order returning P.M. from the CLA to Pennhurst. Judge Rosenn would remand. Accordingly, the judgment of the district court will be reversed and the cause remanded to the district court with directions to reconsider the record and give the views of the parents appropriate weight.
 
 
 35
 ROSENN, Circuit Judge, concurring.
 
 
 36
 I believe that the district court erred in ordering the transfer of P.M. to the community living arrangement (CLA), but I reach this conclusion on grounds differing from those relied upon by Judge Aldisert. Although I agree with Judge Aldisert that in certain situations "the relationship between parent and child is constitutionally protected," Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978), and that the Constitution recognizes a "private realm of family life which the state cannot enter," Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944);[1] see Lehman v. Lycoming County Children's Service Agency, 648 F.2d 135, 163-65 (Rosenn, J., dissenting), aff'd, --- U.S. ----, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982), I share Judge Sloviter's doubts concerning the applicability of this constitutional right to situations such as the instant case in which the family relationship has been disrupted because the parents have surrendered custody of their minor child. But I do not think it necessary to decide this constitutional issue in the narrow fact situation before us. When we originally remanded this matter to the district court in Halderman v. Pennhurst State School and Hospital, 612 F.2d 84 (3d Cir.1979) (in banc) (Halderman I ), reversed, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), we instructed the court to make "individual determinations" as to "the appropriateness of an improved Pennhurst" for each patient. Id. at 114. In the case of P.M., I believe the Hearing Master and the district court erred in resolving this question contrary to the views of the parents.
 
 
 37
 Undoubtedly, the law does impose outer limits on parental authority. When parents attempt to exercise controls over their children in ways that intrude adversely upon the constitutional rights of the children, the parental rights must give way. Thus, in Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court held that the child's liberty interest prevails over the parents' desire to prevent the child from obtaining a lawful abortion during the first trimester of pregnancy. Likewise, in Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), parents were not permitted the final determination as to whether their minor child should be institutionalized because the child had an independent constitutional interest in avoiding unnecessary confinement. See 442 U.S. at 604, 99 S.Ct. at 2505. These cases stand for the proposition that when the parents' interests clearly collide with the interests of their minor child, whatever authority parents may ordinarily possess is necessarily subordinated to the child's best interest, notwithstanding the recognized right of parents in the well-being of their children.
 
 
 38
 Nevertheless, both Danforth and Parham v. J.R. reaffirm the time-honored common law notion that in most circumstances the parents are the individuals best capable of making informed decisions on behalf of their offspring. Our legal system surrounds the family with a protected status because it acknowledges the importance of the parent-child relationship and the significant deference this relationship deserves. Throughout the history of mankind, parents have been permitted and expected to make numerous decisions in behalf of their children's development and best interest, not because society has considered it a parental prerogative to exercise absolute authority over family members, but rather because society believes that parental authority usually will be exercised to advance the children's welfare. As Chief Justice Burger explained in Parham v. J.R., supra,The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.
 
 
 39
 442 U.S. at 602, 99 S.Ct. at 2504. See also id. at 621, 99 S.Ct. at 2513 (Stewart, J., concurring).
 
 
 40
 Despite this fundamental presumption that parents act in the best interests of their children, in the instant case the Hearing Master and the district court concluded that the community living arrangement proposed for P.M. would be "more beneficial for his habilitation than remaining at Pennhurst would be." Although the medical and psychological experts were in some disagreement, the record does appear to contain support for this conclusion. But it seems to me that the Hearing Master and the district court committed legal error in attaching insufficient weight to the personal objections of Dr. and Mrs. M., P.M.'s parents, to the transfer. The Hearing Master should have started from the premise that the parents' special relationship with their son gave them particular insight into what would be in P.M.'s best interest. A transfer against the parents' wishes should have been ordered only if there was a compelling justification for the transfer. And there is no such compelling justification here.
 
 
 41
 The Hearing Master did not adequately appreciate that these were parents who had a deep emotional interest in their child from the moment of his birth. Their objection to the transfer was nothing impulsive but was obviously a matter to which they had given serious consideration. They had studied the advantages and disadvantages of the CLA and Pennhurst, consulted with experts, and were deeply concerned. Beginning with P.M.'s commitment to Pennhurst, the parents had visited him frequently and had also inspected the proposed CLA. They demonstrated concern and love for their son.
 
 
 42
 When discussing a child as profoundly mentally retarded as P.M., experts necessarily engage in a considerable degree of speculation as to the child's abilities, needs, and potential. In P.M.'s case most of the experts favored the transfer because they thought the community living arrangement would offer the best opportunity for P.M. to maximize his potential. Nevertheless, there was significant testimony from the parents' own experts, Dr. Harold Rubin and Ms. Deborah Nickles,[2] opposing the transfer on the ground that Pennhurst was a preferable environment for P.M. because it was specially designed to protect him from the perils he constantly faced due to his handicaps. In addition, P.M.'s parents offered substantial testimony--at times eloquent--in support of their position that Pennhurst would be more beneficial to their son than the proposed CLA would be.[3] The parents of P.M. strongly preferred to keep their son in the familiar and relatively secure surroundings of Pennhurst rather than place him in what they must have perceived as the experimental and risky community living arrangement, absent some positive assurance that P.M. would benefit from the CLA. None of the experts could provide the positive assurance the parents were seeking. Under these circumstances, I think the parents' opposition to the transfer was not only a reasonable and sound view, but more important, it was arguably the view most in accord with the interests of their son.
 
 
 43
 The record in this case presents substantial evidence of thoughtfulness, concern, and careful judgment by loving and emotionally attached parents. Precisely because the parents' interest in P.M. sprang from their subjective feelings of love for their child, their opinions were entitled to substantial weight. The concern and reflective consideration demonstrated by P.M.'s parents gave their views an inherent force to which the Hearing Master and the district court paid insufficient deference. Thus, I believe the district court erred in ordering P.M.'s transfer merely on the ground that the objective evidence--as related and interpreted by coldly detached professionals--indicated that the CLA would be "more beneficial to P.M.'s habilitation" than Pennhurst.
 
 
 44
 In our prior decision in Halderman I, we endorsed a presumption favoring transfer of Pennhurst residents to community living arrangements. Yet we also acknowledged that some residents, "because of advanced age, profound degree of retardation, special needs or for some other reason," would actually be harmed by such a transfer. See 612 F.2d at 114. In the instant case, the opposition of the parents to the transfer was more than sufficient to suggest that P.M. is in this class of individuals who would be better off at Pennhurst, thereby rebutting the presumption favoring transfer.
 
 
 45
 The district court assumed that by expressing their concerns for the habilitation plan, some of which were accommodated, and by vigorously objecting to the transfer out of Pennhurst, the parents were asserting the "right to direct all aspects of their child's habilitation [in a publicly funded facility] .... Were the Court to accept the parents' position, parents of all Pennhurst residents would be accorded the right to overrule treatment decisions of the Pennhurst staff, including the location of their child within Pennhurst."[4] The parents, however, were not complaining about staff treatment. They were not asserting a right to direct all aspects of their child's habilitation. Nor were they attempting to override a state decision or even any decision of Pennhurst. They were simply objecting to the transfer.[5]
 
 
 46
 Both Judge Aldisert and Judge Sloviter believe that the master's finding that the CLA would be "more beneficial" to P.M. was not clearly erroneous on this record. Although I am inclined to agree, I feel strongly that this should not be the primary focus of our inquiry in this case. Instead, we must inquire whether the Hearing Master had a compelling justification for rejecting the views expressed by P.M.'s father and mother--the two individuals ordinarily presumed to know best what is in their child's interest. Neither the Hearing Master nor the district court made this inquiry.
 
 
 47
 I therefore believe that the judgment must be reversed and the case remanded to the district court with directions to reconsider the record and give the views of the parents appropriate weight.[6]
 
 
 48
 SLOVITER, Circuit Judge, dissenting.
 
 
 49
 I share with my colleagues the sympathy and concern for the circumstances of the parents of P.M. which may underlie their decision in this case. But our sympathy and concern for the parents cannot obscure the facts that Judge Aldisert in his separate opinion has attempted to expand for the first time the parents' constitutional right to direct their children's upbringing to parents of children in state custody and that both Judge Aldisert and Judge Rosenn base their decision on assumptions about the proceedings before the Hearing Master and the district court which are unsupported in the record. The order of this court now may require that the district court return a child to Pennhurst over the finding that his transfer to a community living arrangement was more beneficial to his interests than residence at Pennhurst. This decision may eviscerate the holdings of our two in banc decisions affirming the transfer of Pennhurst residents, including children, to community living arrangements where their rights to habilitation can be maximized.
 
 
 50
 This ongoing litigation began with challenges to the conditions existing in Pennhurst State School and Hospital, a Pennsylvania state institution for the mentally retarded. As the Supreme Court noted, the findings of fact of the district court are undisputed: "Conditions at Pennhurst are not only dangerous, with the residents often physically abused or drugged by staff members, but also inadequate for the 'habilitation' of the retarded. Indeed, the [district] court found that the physical, intellectual, and emotional skills of some residents have deteriorated at Pennhurst." Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 7, 101 S.Ct. 1531, 1534, 67 L.Ed.2d 694 (1981) (footnote omitted). The history of the litigation has been briefly sketched in Judge Aldisert's opinion. The district court originally ordered that Pennhurst residents be transferred to community living arrangements. On appeal, we affirmed except for those residents who "because of advanced age, profound degree of retardation, special needs or for some other reason, will not be able to adjust to life outside of an institution and thus will be harmed by such a change." Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 114 (3d Cir.1979) (in banc). On remand from the Supreme Court we again affirmed the district court order except as modified in accordance with our earlier opinion. 673 F.2d 647, 656, 661 (3d Cir.1982) (in banc). To effectuate the individual consideration required by our orders, we directed that an individual determination be made for each Pennhurst patient. The procedure established by the district court for individual determinations has been before this court on a number of occasions during different phases of this litigation. It entails a number of steps.
 
 
 51
 A Planning and Assessment Team, established by the county case manager to develop the individual habilitation plan (IHP), typically includes state and county professionals, the case manager for the individual patient, others directly involved with the patient, and, as in this case, the parents or, in other instances, the guardian or a certified advocate. The Deputy Secretary for Mental Retardation (or designee) attempts to resolve team disagreement through working with the team. The Special Master under the court's order must review each IHP "to ensure that it provides, in the least restrictive setting, such minimally adequate habilitation as will afford a reasonable opportunity for each individual to acquire and maintain such life skills as are necessary to enable him or her to cope as effectively as his or her capacities permit." App. at 24a. Under the general procedure, if the IHP is approved by the Special Master, the transfer proceeds. If there is objection by interested persons, including the parents, a separately appointed Hearing Master conducts a hearing "to determine whether the living arrangements and services being provided the resident at Pennhurst are more beneficial to the resident's habilitation than the living arrangements and services which have been made ready in the community in accordance with the IHP." App. at 25a.
 
 
 52
 All of these procedures were followed in P.M.'s case. As set forth more fully in Part II of this dissent, P.M.'s parents participated throughout in the process. The Special Master approved the individual habilitation plan for P.M. which provided for transfer to a community living arrangement; the parents objected; and the Hearing Master, after conducting the requisite hearing, concluded that transfer to the CLA would be more beneficial for P.M.'s habilitation. Exceptions to the Master's report were filed and the district court, after a hearing at which P.M.'s parents introduced no new evidence, adopted the Master's finding that the CLA would be "more beneficial" to P.M.
 
 
 53
 I agree with Judge Aldisert that this finding was not clearly erroneous. Judge Aldisert's typescript op. at 12. It is unclear to me whether Judge Rosenn is also in accord on this issue. In any event, Judge Aldisert and I begin at the same starting point, the finding that transfer to the CLA would be "more beneficial" to P.M. than continued institutionalization, and it is on this basis that our legal analysis and review must proceed.
 
 I.
 The Parents' Asserted Constitutional Right
 
 54
 I agree with Judge Aldisert that the cases have established a parental right, grounded in constitutional notions of privacy, to direct the upbringing and care of their children. That right provides the basis on which parents can resist the state's efforts to intrude upon parental decisions made with regard to children under their care. Thus, for example, the state cannot compel education of a child in a public, rather than a private, school, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); cannot preclude children from being taught in a foreign language, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); and cannot require children to attend high school when that conflicts with the parents' sincere religious belief, Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). However, the parental right upon which these holdings were based was recognized only in the context of the integrity and autonomy of the family unit.
 
 
 55
 This case is distinguishable because the parents of P.M. have voluntarily relinquished his custody to the state. The government has not interfered in a decision about the rearing of a child in the family unit nor has it removed the child from parental custody. Compare Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). P.M.'s parents are free to regain custody over him. There may be practical limitations which discourage such a course, but there is no legal impediment.
 
 
 56
 No case has extended what Judge Aldisert refers to as the parents' "substantial constitutional right ... to direct and control the upbringing and development of their minor children" to parents of a child in state custody. Since Judge Aldisert speaks only for himself on this issue, it is not necessary to discuss the analytic and practical problems entailed in such an extension, such as whether and how it would be applied to children in involuntary custody.
 
 
 57
 On the other hand, I agree with my colleagues that the parents' interest in their child does not stop at the gates of a state institution. In many, if not most, instances the parental interest will be identical with that of the interest of their institutionalized child and the right which they seek to protect will be that of their child, such as the right of personal security. See, e.g., Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In those cases the traditional constitutional balancing referred to by Judge Aldisert between the individual's right and the government's interest must be undertaken. However, as the Supreme Court has recognized, there are instances when the parents' interests and the child's interests may not coincide. See Parham v. J.R., 442 U.S. 584, 602-04, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101 (1979); Wisconsin v. Yoder, 406 U.S. at 230-32, 92 S.Ct. at 1540-41. Indeed, there are instances in which those interests collide. In those circumstances, the parents cannot rely on cases grounding a parental right on the family structure, because, as noted in Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 75, 96 S.Ct. 2831, 2844, 49 L.Ed.2d 788 (1976), that structure will have already been fractured. Therefore, it is inappropriate to balance only the parents' interest against the significance of the governmental interest, as Judge Aldisert suggests. The parents' interest cannot override the child's separate constitutional right.
 
 
 58
 In Danforth, the Court held that a child's abortion decision could not be overridden by her parents on the precedent of cases affirming parental authority or control. Instead the Court held the parents could not exercise an absolute veto over the child's abortion decision because the child's liberty interest was paramount. Similarly, in Parham v. J.R., supra, the Court recognized that "parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized." 442 U.S. at 604, 99 S.Ct. at 2505. The Court held "that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied." Id. at 606, 99 S.Ct. at 2506. The parents could be heard but did not have the final decisionmaking authority when the child's liberty interest was at stake. The analysis in Parham, which involved mentally ill children, was made applicable to mentally retarded children in Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 646, 99 S.Ct. 2523, 2526, 61 L.Ed.2d 142 (1979).
 
 
 59
 Because we start with the premise that the transfer to the CLA will be "more beneficial" to P.M. than his continued residence at Pennhurst, and the parents nonetheless challenge that transfer, this case involves a collision between the parents' interest and the child's right, here the child's acknowledged "substantial liberty interest in not being confined unnecessarily for medical treatment." Parham, 442 U.S. at 600, 99 S.Ct. at 2503. Thus this case must be governed by the precedent of the most closely analogous cases, Danforth, where the Court rejected an absolute parental veto, and Parham, where the Court did not rely on the asserted prerogative of the parents but reposed its confidence in the neutral professional medical decisionmakers.
 
 
 60
 In summary, I believe the parental constitutional right on which Judge Aldisert relies cannot govern our decision in this case for two reasons. First, that parental constitutional right was enunciated in cases which involved a routine child-rearing decision made within the context of an ongoing family relationship. Here, as Justice Brennan noted in Parham, "a break in family autonomy has actually resulted in the parents' decision to surrender custody of their child to a state mental institution." 442 U.S. at 631, 99 S.Ct. at 2518 (concurring in part and dissenting in part). Second, as in Danforth and Parham, we are concerned with the child's separate constitutional right, and we cannot necessarily rely on the parental authority to vindicate the child's independent interests. Thus when a child is in state custody the parents must be given a full and fair opportunity to show that their interest in the decision at issue is congruent with the child's interest and right. If so, then the parents are in fact advancing the child's right in challenging the decision. If, however, the child's right is shown to be incongruent with the parents' position, then it is the child's right, not the parents', which must be considered. The parents may again be given an opportunity to be heard regarding the effect of the proposed action on the child's right, but it would be anomalous to engage in an analysis in terms of the parents' interest, when it is the child's interest that will be adversely affected.
 
 II.
 
 61
 P.M.'s Parents' Involvement in the Transfer Decision
 
 
 62
 Throughout the proceedings directed by the district court relating to transfer of Pennhurst patients to community living arrangements, particular care has been exercised to ensure participation by parents of children resident at Pennhurst in the transfer decision. Although Judge Aldisert characterizes the protection afforded to P.M.'s parents as only "procedural", Judge Aldisert's at 710-711, and Judge Rosenn also suggests that the parents' wishes were given inadequate weight, Judge Rosenn's at 715, in fact the record shows that P.M.'s parents were accorded not only the procedural rights of notice and the opportunity to be heard, but their concerns were addressed and their suggestions were accommodated and revisions were made.
 
 
 63
 The district court's order of April 24, 1980, expressly provides for parental participation:
 
 
 64
 No school-age resident of Pennhurst shall be returned to the community unless and until an appropriate community living arrangement has been established in accordance with that resident's individual habilitation plan which has been developed with the opportunity for full participation by the resident's parents or guardians and other advocates for the resident, and unless and until appropriate educational facilities are available in accordance with that resident's individual educational plan, which has been developed with the opportunity for full participation by the resident's parents or guardians and other advocates for the resident.
 
 
 65
 App. at 21a-22a. In accordance with this order, a Planning and Assessment Team was convened and developed a plan proposing P.M.'s transfer to a community living arrangement. Thereafter, P.M. was taken to the suggested CLA for more than 20 daytime and overnight visits. App. at 44a, 237a. On May 11, 1981, there was a meeting regarding P.M.'s habilitation plan attended by P.M.'s parents and most, if not all, of the professionals with responsibility for his case. In addition to the parents, the following were present: Pam Scoggins, his case manager from the Chester County MR Case Management Unit; Sue Crossman, his teacher for the preceding six years from the Liberty Forge School, and Camen Bowden and Ruth Copenhafer, teacher aids from the Liberty Forge School; Melissa Perot, occupational therapist from Chester County; Bill Park, Project Director from Community Homes and Debbie Maggio from the same agency; and Elyse Defoor, speech therapist, Nancy Kulp, licensed practical nurse, Debbie Brodbeck, first shift aid, Bob Doud, Program Manager, Lenko Kovach, psychologist, Janice Allen, case worker, Jean Bauman, physical therapy aid, and Kathy Trotta, occupational therapist, all from Pennhurst. App. at 234a-36a.
 
 
 66
 The CLA proposed in the plan is a four bedroom ranch-style home in Malvern occupied by a live-in couple and two other retarded boys aged 21 and 22. The house is in a quiet residential area located on a cul de sac. The plan provided for 1:1 staff supervision for P.M. and awake night staff, at least initially. Safety adaptations such as a fence, safety gates, and a grab bar in the bathroom were made. The plan contained a program of self-help skill training, socialization, pre-language communication, occupational and physical therapy and recreational activity. P.M. was to continue at the school which he had attended for six years. Without reviewing all of the details, it is important to note that the plan and portions thereof were submitted to independent professional judgment and evaluation throughout. Thus, for example, a physical therapy consultant of the Bureau of Professional Services of the Commonwealth of Pennsylvania made a consultation visit to Pennhurst for the purpose of evaluating the physical therapy program developed by the staff for P.M. In his report to the Superintendent of Pennhurst, he agreed that under the arrangements made, P.M. "could function in a community living facility and be given the opportunity to develop to a higher level." He continued, "The decision of whether or not institutional care is more effective than a community living arrangement is difficult to answer; however, the progress that has been made thus far and the continuation of a closely supervised program leads me to believe that he will benefit in a home-like atmosphere." App. at 274a.
 
 
 67
 The parents' objections to the proposed plan were mediated by Pennhurst Superintendent Kopchick. This process allayed some of their concerns; for example, controversy with respect to the proposed occupational and physical therapy programs was satisfactorily settled. App. at 118a. P.M.'s parents do not argue here that the CLA is unsafe.
 
 
 68
 The plan was reviewed by the Office of the Special Master established by the district court for that purpose, which found "that the community services prescribed in the Plan will be more beneficial for the habilitation of [P.M.] than the services provided at Pennhurst." App. at 214a. P.M.'s parents were notified of their right to demand a hearing for the purpose of determining whether the living arrangements and services were more beneficial to P.M.'s habilitation than the living arrangements and services being provided at Pennhurst. App. at 214a. P.M.'s parents requested a hearing, which was held before the Hearing Master. Again the parents had the opportunity to present evidence and arguments, to require the attendance of witnesses, if necessary, and to ask questions of other witnesses. The Master in his Report specifically addressed each of the comments of P.M.'s parents and their two witnesses, and concluded,
 
 
 69
 I am convinced beyond any doubt that the program the County is proposing for P.M. will be more beneficial for his habilitation than remaining at Pennhurst would be--because it is designed around his potential rather than his limitations, and because it has been so carefully and thoughtfully structured to let him grow and explore as far as his abilities will take him.
 
 
 70
 App. at 298a.
 
 
 71
 The parents excepted to the Master's Report. Although they made some general challenges, they clearly, through their counsel, stated as the essence of their position "that the Court should not consider the basis of the parents' nonconsent." App. at 326a. Counsel stated he was not arguing that the CLA was dangerous or that the state or county have not provided the best possible living arrangements under the circumstances. App. at 328a. Instead, he articulated the parents' position as their right to make the decision regarding transfer "regardless of whether or not the parents' decision is right or wrong." App. at 330a.
 
 
 72
 It is evident that the parents were provided with every incident of the parental right or interest to which they were entitled. But once there is a determination made that the child's interest was best served by his transfer to the community living arrangement, it is his right that takes precedence. The determination that transfer was beneficial to P.M. was made by a neutral factfinder as required in Parham. The professional judgment in favor of transfer was made by the numerous professionals, state and county, who participated in the preparation and approval of the individual habilitation plan.[1] The statements of the state and county witnesses that they would defer to the parents' wishes represented a policy position. It must be distinguished from the professional judgment by the state and county's social and medical personnel, all of whom supported the transfer as beneficial to P.M. The Chester County professional with the most direct involvement with P.M., Ms. Scoggins, his case manager, testified "that the extra stimulation, attention and exposure to different experiences provided in this community placement, will be enriching and beneficial to [P.M.'s] growth and development." App. at 51a-52a.
 
 
 73
 In addition to the neutral factfinder's decision as required by Parham, the parents were provided with a second and third tier review by the Hearing Master and the district court, which afforded them the opportunity to show that the neutral factfinder was erroneous in finding that transfer was to P.M.'s interest. The Hearing Master correctly characterized the testimony of the two experts for the parents as "highly abstract and theoretical", which "sought to reargue global issues, such as the need for institutional programs and the validity of various 'normalization' theories." App. at 296a. Since neither expert had observed P.M. in Pennhurst nor viewed the Malvern community living facility, there was ample basis for the Hearing Master to come to a different conclusion which accorded with the recommendation of those professionals who had worked more closely with P.M. Judge Aldisert errs when he attributes the Master's conclusion to the presumption imposed by this court in favor of deinstitutionalization, since the Master stated in his report that "it is not necessary to resort to the presumption in this matter, since the County has done a truly excellent job in planning for P.M.'s community placement (in part because of the parents' active and constructive participation) and since P.M.'s program at Pennhurst, though it has helped him in many ways, seems to have reached its limit and indeed has begun to recede." App. at 289a-90a. Even if the Master had relied upon the presumption in favor of deinstitutionalization, it was one mandated by in banc decisions of this court, which a panel is not free to disregard.
 
 
 74
 Although both Judge Aldisert and Judge Rosenn disclaim giving the parents an absolute veto over the transfer decision, in effect that is precisely what P.M.'s parents have requested and exactly what this decision gives them. P.M.'s parents have made two principal arguments before us--that no liberty interest of P.M. is implicated in the transfer decision, and that "the decision of the parents should have controlled." P.M. has an unchallenged liberty interest in not being confined unnecessarily, and as we found in our in banc decisions also has a right to habilitation. It follows that the decision of the parents cannot control as a matter of constitutional law. Judge Rosenn asks "who is it then that insists on the transfer and by what right." Judge Rosenn's at 714 n. 4. Since P.M. is a severely retarded 12 year old child who cannot speak for himself, it is the professionals to whom he has been entrusted, i.e. the Parham "neutral factfinder", who decided in favor of the transfer. The district court was meticulous in following the Supreme Court's decision in Parham which required a neutral factfinder to speak for the child's interest. I can find no basis to reverse.
 
 
 75
 Finally, at a minimum, the district court should have the opportunity to consider the effect of possible changed circumstances. We have been told there are only two remaining children of school age currently at Pennhurst, Brief for Appellee PARC, et al. at 8 n. 1, P.M. has now been in the community living arrangement for more than a year, and we know absolutely nothing about P.M.'s adaptation and progress in the intervening period. Since the panel disposition is to remand, and Judge Rosenn agrees with me that changed circumstances may be relevant to the district court's ultimate decision, I assume that this issue is open for consideration by the district court.
 
 
 
 [1]
 Appellants raise a third contention in their brief before this court. They argue that the "district court erred in compelling the Commonwealth [of Pennsylvania] and the County [of Chester] to override the parental transfer decision in this case." Joint Brief for Appellants at 41. While I have some difficulty in determining the precise basis of this contention it appears to rest on the assertion that "states have a valid interest in preserving the family unit and maintaining parental authority over children," id., and that since the Commonwealth would not compel the transfer of P.M. over the parents' objections neither should the district court. The Commonwealth concurs that it would not compel transfer in this case, citing its "long-standing, informal policy of respecting the parents' preferences unless those preferences are not in the best interest of the child ...." Brief for Amicus Curiae at 4 n. 1. Because the Commonwealth developed this position on the basis of the Supreme Court decision in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (holding that a state could not constitutionally require compulsory school attendance of children through age sixteen), it is at bottom a constitutionally based policy, raising the same issues and concerns as the appellants' denominated constitutional argument in this case. Therefore, I will focus my discussion on the asserted constitutional claim of appellants
 
 
 [2]
 The master, under the district court's order following the Supreme Court's June 1980 stay of our initial appellate decision, was directed to determine that the transfer of P.M. to a CLA was voluntary as well as appropriate or beneficial. In its February 26, 1982 memorandum issued in support of its transfer order, however, the district court ruled that after the Supreme Court disposed of the appeal, the stay lifted and thus any potential objections to the master's determinations on the voluntariness of P.M.'s transfer were moot. No appeal was taken from this mootness ruling, and I express no opinion as to either the ruling itself or the master's finding that the transfer was voluntary
 
 
 [3]
 Although the master did not expressly rely on this presumption in reaching his decision, Hearing Master's Report at 14-15, reprinted in app. at 289a-90a, I will treat it as if he did because the presumption is clearly available to provide added support for that decision
 
 
 [4]
 A major safety concern of the parents that has never been resolved is the possibility of a fire in the CLA that could isolate P.M.'s room from a safe exit route
 
 
 [5]
 Because the instant case involves a conflict between the parents' desires and the dictates of a United States district court, it is the due process clause of the fifth amendment and not that of the fourteenth amendment that is directly at issue. The analysis, however, would be the same under the fourteenth amendment
 
 
 [6]
 While the instant case is not couched in classic child custody terms, in that the conflict is not that of parental custody as against state custody, I feel the rights developed in the custody cases are relevant here. The question at issue in the instant case is whether child custody is more appropriate in one type of state institution or in another state-sponsored living arrangement. The rights established in the custody cases provide analogous support for appellants here because the parents, at bottom, are expressing strong and substantial concerns as to where they feel custody should be
 
 
 [7]
 The right at issue here, that of parents to be able to direct and control the upbringing of their children without unnecessary governmental interference, is a right protected under the auspices of substantive due process. By analogy to fifth and fourteenth amendment equal protection cases, the right herein recognized is analytically equivalent to that group of rights requiring an "intermediate" level of scrutiny. See Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (U.S.1982) (education); Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (alienage); Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (illegitimacy); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (sex discrimination)
 
 
 [8]
 As a general rule, we will not reverse a decision made in a prior proceeding on grounds that were not urged or argued in that proceeding. Walker v. Sinclair Refining Co., 320 F.2d 302, 305 (3d Cir.1963). This is not an inflexible rule, however, and it will not be applied when public interest and justice so warrant. Franki Foundation Co. v. Alger-Rau & Associates, Inc., 513 F.2d 581, 586 (3d Cir.1975). Here, although the master failed to give sufficient consideration to the constitutional rights of the parents in determining the placement of P.M., neither justice nor public interest compels reversal because the district court's review of the master's report could have easily corrected the error. I will, therefore, focus my attention on the district court proceedings
 
 
 [9]
 Exception 11 to the report stated:
 The Parents except to ... the Hearing Master's Finding that the proposed community placement of P.M. is "more beneficial" than his remaining at Pennhurst [in that it] (1) ... unconstitutionally intrudes upon areas reserved for parental ... judgment ....
 Exceptions to the Hearing Master's Report at 4, reprinted in app. at 303a.
 
 
 [10]
 The district court summarized its views of the rights of the parents as follows:
 Mindful of this venerable legal tradition, this Court's Orders in this case have sought to provide for and encourage parental involvement in the process of developing an individual habilitation plan. Parents and guardians are urged to become intimately involved as members of the team which determines the individual habilitation plans for each member of the plaintiff class. Pursuant to this Court's Orders, parents are given the right to demand a hearing in the event they object to a habilitation plan transferring their son or daughter to a community living arrangement. At the hearing, they have a right to be represented by counsel, present evidence, and present argument as to why a community living arrangement will be less beneficial to their child's habilitation than his or her continued residence at Pennhurst. In addition, if the parents are dissatisfied with the Master's Report, they may file exceptions with the Court, as have the parents of P.M. in this case.
 App. at 362a-63a.
 
 
 [11]
 Archie Simmons, for example, a physical therapist consultant, testified that the CLA would meet P.M.'s needs but "strongly suggest[ed] that [P.M.] be evaluated periodically, 3 to 6 month intervals, in order to assess his physical and psychological status." App. at 48a. Further, Melissa Perot, an occupational therapist, expressed concerns that the proposed habilitation plan might "prove insufficient to maintain his [P.M.'s] present rate of progress ...," and suggested that other, more intensive therapy might be required. Id. at 254a
 
 
 [12]
 As Ms. Nichols, the other expert who testified in support of the parents' position stated, "[the o]ne-to-one coverage is perhaps the most restrictive thing that I've heard of in a long time. It implies in fact that perhaps the setting is dangerous to [P.M.] without that type of coverage." App. at 148a-49a
 
 
 [1]
 The right of parents encompasses the opportunity to nurture, educate, love, and manage their child, a right which Justice Brennan has characterized as a "constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right ...." Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 846, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977)
 
 
 [2]
 Dr. Rubin was a psychologist associated with West Chester State College and Ms. Nickles was Chairperson of the Department of Special Education at West Chester State
 
 
 [3]
 In her testimony, P.M.'s mother addressed numerous concerns that her son would meet in community living, including the problem of communication. She stated that for all the laudable sentiments of the professionals
 who insist on the CLA as a superior environment for our particular child's needs, no one can say for certain what they are, beyond the love, care, and satisfaction of basic hungers, he has had at Pennhurst. No one has determined that there is in his brain a speech center that can be developed with current technology or special education methods ....
 Some means of communication is absolutely essential for neighborhood living, most desirably intelligible speech the average, uninitiated neighbor can understand. But to my knowledge, this point has never been addressed or acknowledged. Certainly, the number of professionals of various species my husband and I have met with interminably have not included one who could provide anything more than a vaguely optimistic but evidentially unsupported answer.
 A neighborhood apartment, rowhouse, rancher or colonial is no magic talisman to compensate for insufficient data and inexact methodology in cases such as our son's. We prefer ... prompt, on site medical attention from professionals, such as Dr. Robles, who has treated him in the past, who knows and understands our son, to the uncertainty of a community practitioner with no previous experience with the profoundly retarded as a broad and enormously varying category.
 While Pennhurst is certainly not ideal, though much improved since 1972, the average American home has long been cited by studies as a more dangerous site than many workplaces. The CLA's we have seen are designed as average American homes, appropriate for the functional retarded, but hazardous to children like our son ....
 I was denied the personal power to back up my sense of responsibility to save [P.M.] before birth. Now it seems incumbent to try to protect his existence, make him safe and comfortable, provide the best opportunities for whatever development he might turn out to have, some potential without expecting miracles. Since the therapy equipment list alone is sufficient evidence to me that decentralized CLA's cannot cost effectively match this quality, I feel the CLA is deprivation for [P.M.].
 
 
 [4]
 The district court concluded that the law does not give parents "unbridled discretion in every area of decision-making" especially where, as here, "a retarded child has been committed to the custody of the Commonwealth and Chester County ...." But the Commonwealth of Pennsylvania supports the objections of the parents to the transfer. Chester County also supports the parent's objections. Both believe that under the circumstances of this case, it is improper to disregard the views of the child's parents. One is compelled to ask who it is then that insists on the transfer and by what right
 
 
 [5]
 It should be noted that were it not for the underlying litigation which is again under review by the Supreme Court, 50 U.S.L.W. 3998.01 (1982), the issue in this ancillary review could not be heard in the federal courts
 
 
 [6]
 If there have been any changes in circumstances since the time of the original hearings in this matter, I see no reason why the district court should not have an opportunity to consider such changes in the proceedings on remand
 
 
 [1]
 See Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 648-50, 99 S.Ct. 2523, 2527-28, 61 L.Ed.2d 142 (1979) (upheld professional staff team approach to decisionmaking as comporting with Parham due process requirements)