Michael D. Kelley et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Catherine A. Kelley, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued June 8, 1983, before Judges WILLIAMS, JR., CRAIG and MACPHAIL, sitting as a panel of three.

*Michelle A. Terry,* with her *Mark A. Kaufman,* for petitioners.

*Michael Alsher,* Associate Counsel, with him *Charles Hasson,* Associate Counsel, and *Richard L. Cole, Jr.,* Chief Counsel, for respondent.

OPINION BY JUDGE WILLIAMS, JR., October 27, 1983:

This case involves the consolidated appeals of Catherine and Michael Kelley from the decision of the Unemployment Compensation Board of Review denying benefits pursuant to Section 402(e) of the Unemployment Compensation Law (Law).[1]

The Board made detailed factual findings, which, for the most part, are not in dispute. These findings reflect the following scenario. The claimants, husband and wife, were relief week-end supervisors for Pan Am Corporation, a provider of residential care

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(e), Under this section, a claimant is ineligible for benefits for any week in which his employment is due to willful misconduct connected with his work.

for the mentally retarded. The claimants were employed in a group-home which provided residential and treatment services to mentally handicapped residents of Montgomery County pursuant to a contract between Pan Am and the county. The claimants' job responsibilities required that they provide total care, supervision and maintenance of residents specifically assigned to them.

In the course of their employment, the claimants observed conditions which led them to conclude that residents were not receiving adequate care and treatment. Among the conditions which allegedly concerned them were inadequate food and medication. The claimants protested these conditions to their immediate supervisor and to their project director, who was the highest ranking company employee with whom they had ever had any direct communication. When their protests failed to achieve satisfactory results, the claimants wrote a letter in which they described conditions in the group-home which they felt compromised the well-being of the residents.[2] The letter was addressed to the Montgomery County agency responsible for placement of the mentally retarded; to the Special Master in a federal court action involving standards of treatment and disposition of mentally re-

---

[2] The record is ambiguous, and the Board's findings fail to address the sequence of events immediately before the claimants drafted and published their letter. It appears that one of the claimants had discussions with the legal guardian of one of the residents, and the guardian requested that the claimant contact officials outside the company. There is also testimony that before the letter was drafted, government officials contacted one or both of the claimants and requested that they document their concerns about the adequacy of the care at the group-home. The record does not suggest how the government officials were alerted to the fact that the claimants harbored any concerns about the standards in the group-home.

tarded patients in the Pennhurst State School and Hospital;[3] to counsel for the Association of Retarded Citizens; and to the sister-in-law and legal guardian of one of the group-home residents.[4] Pan Am's president learned of the claimants' allegations regarding conditions at the group-home when he received a copy of the letter from Montgomery County welfare officials. Accompanying the copy was a directive that Pan Am respond within two days with a complete report on the conditions alleged by the claimants. Two days after Pan Am's president learned of the letter, the claimants were discharged.

The company asserts, and the Board found, that the claimants were not fired for the allegations they made in the letter, but because they published their protest to company outsiders without first pursuing the company's internal grievance mechanism. The 4-step grievance procedure, which was published in an employee handbook, was prefaced by the following statement: "If you have a complaint about your job or disagree with a disciplinary or termination action, you have a right to request a review using the following procedure. . . ." The four grievance steps were: (1) discussion of the grievance with the employee's immediate supervisor; (2) submission of the grievance in writing to the project director or department head; (3) submission of the written grievance to a central committee composed of the vice president, the controller and the personnel director; and (4) re-

---

[3] For a summary of the history of this protracted litigation, see *Halderman v. Pennhurst State School and Hospital*, 707 F.2d 702 (3d Cir. 1983).

[4] The letter was not made part of the record in the case, even though there was some conflict over its contents. We must therefore rely on the Board's finding that the letter addressed matters concerning the care and treatment of residents in the facility.

view of the grievance by the president. The claimants concede that they were aware of the existence of a grievance procedure, and that they did not protest internally beyond their project head. However, they assert that they were not aware that the procedure applied to challenges to patient-care conditions like those cited in their letter, as distinguished from individual employee grievances of working conditions or personnel actions particular to them. Even though the Board found that the claimants acted in good faith out of concern for the well-being of Pan Am's patients, it found that their failure to pursue the company's grievance procedure and to consider how their employer's interests might be damaged by their letter constituted willful misconduct.

The claimants challenge the Board's decision on the ground that the record does not support the Board's conclusion that the published grievance procedure was mandatory and that it applied to the type of complaints cited in their letter. Furthermore, they assert that even if the claimants did violate a company rule, their violation was reasonable and in good faith, and therefore did not constitute willful misconduct.

To be sure, the language of the grievance procedure leaves considerable doubt as to whether it was intended to apply to complaints about issues dealing with appropriate patient care, as distinguished from complaints about terms and conditions of employment affecting particular employees. The only evidence supporting the Board's interpretation is the assertion of the company president: the record contains no interpretive memos or evidence of past application to support the Board's broad construction of the procedure. Nor is it clear from the text of the procedure that it was the exclusive means of contesting work-

related conditions. In any event, we believe that the language of the procedure is sufficiently ambiguous for the claimants to have reasonably concluded that it did not apply to the types of complaints addressed in their letter. We therefore conclude that the mere fact that they did not utilize the grievance procedure is insufficient basis for a determination of willful misconduct. *See Boyer v. Unemployment Compensation Board of Review*, 499 Pa. 552, 454 A.2d 524 (1982).

However, our conclusion that the grievance procedure was ambiguous does not resolve this case. There remains a fundamental issue which would exist even if Pan Am had no formal grievance procedure at all. That issue is whether the claimants, by publishing their complaints to persons outside the company in ways which could materially jeopardize their employer's financial and reputational interests, breached standards of behavior which their employer could reasonably expect, such that their actions constitute willful misconduct. This question is one of law, subject to this Court's review. *McLean v. Unemployment Compensation Board of Review*, 476 Pa. 617, 383 A.2d 533 (1978).

In approaching this issue, we are acutely conscious of the tension between two competing interests. On the one hand, it would pervert the purpose of the Unemployment Compensation Law and undermine the public interest if the denial of benefits to employees who "blow the whistle" either deterred disclosure of conditions which may endanger members of the public, or suggested condonation of retaliatory discharges by employers on whom "the whistle was blown." On the other hand, we do not think it unreasonable for employers to expect some degree of confidentiality and that employees will voice their complaints internally before exposing their concerns to interested outsiders.

Internal airing of employee grievances affords an employer an opportunity to alleviate conditions which require attention; it also allows the employer to correct any misinformation which may be the basis for the employee's grievance. The balancing of these interests must respond to the particular circumstances of each case. Consistent with the concept of good cause enunciated in *Frumento v. Unemployment Compensation Board of Review*, 466 Pa. 81, 351 A.2d 631 (1976), we must determine whether, under the circumstances, the claimants' actions were justifiable and reasonable.

Our review of this case must be guided by the Pennsylvania Supreme Court's decision in *Boyer v. Unemployment Compensation Board of Review*, wherein benefits were granted to a municipal employee who was discharged for writing a letter of protest to his supervisor about personnel memos which the supervisor had written. The supervisor, in his memos, criticized the employee's work and threatened disciplinary action. The supervisor sent copies of his memos to other municipal officials, including the mayor of the city. In response, the employee sent copies of his letter of protest to all of the recipients of his supervisor's memos. The Court held that the employee's actions were reasonable and justificable. 499 Pa. at 558, 454 A.2d at 527. Factors which the Court noted relative to the reasonableness of the employee's actions were: (1) the employee's good faith belief that his supervisor's criticisms were unjustified, and possibly motivated by racial animus; (2) the employee's efforts to resolve the problem by means of discussions with his supervisor and the personnel manager of his department; and (3) the fact that he sent copies of the letter to only those persons who had received copies of his supervisor's memos. 499 Pa. at 558, 454 A.2d at 525-27.

A comparison of the circumstances of *Boyer* with those of the instant case leads us to hold that the claimants' actions do not constitute willful misconduct. First, there is little room for argument that the issue addressed in the claimants' letter, *i.e.*, the care and treatment of the mentally handicapped—especially those dependent on the public for their maintenance—is one of pre-eminent concern. Of course, the fact that the letter dealt with a matter of considerable public concern would not insulate the claimants from a determination of willful misconduct if their motives were tainted by malice or indifference. However, the Board found as a fact, and we have no reason to dispute, that their motivation in writing the letter was to improve the living conditions of their patients. Furthermore, we believe that the claimants acted reasonably in their attempts to resolve the conditions internally. They protested the conditions to the highest ranking official with whom they had any personal contact. When those efforts failed, we do not believe that reasonableness required that the claimants consult persons who were, from their perspective, totally invisible and anonymous. Finally, it is significant that the claimants sent their letter to only persons who had some official or legal interest in the conditions they reported.

We reiterate our concern that the Law be applied so as to recognize legitimate employer interests in confidentiality and employee loyalty. At the same time, it would be inconsistent with the liberal purpose of the law to deny benefits to claimants who reasonably and in good faith disclose conditions which may adversely affect company outsiders. Each case of this type must be weighed on its own facts to determine whether, in light of his responsibility of loyalty to his employer, the employee acted justifiably and

reasonably. Our careful weighing of the factors in this case convinces us that the balance tips in favor of the claimants.

Accordingly, the decisions of the Board are reversed, and the cases remanded for computation of benefits.

### ORDER

AND Now, this 27th day of October, 1983, the orders of the Unemployment Compensation Board of Review at Decisions No. B-199123 and B-199124 are reversed, and the cases remanded for computation of benefits.